Pro Se 1 (Rev. 12/16) Complaint for a Civil Case - TXND (Rev. 9/25)

**ORIGINAL**

FILED-USDC-NDTX-DA
'26 JAN 29 AM10:36

# UNITED STATES DISTRICT COURT

for the

Northern District of Texas

Dallas Division

| | |
|---|---|
| ERICK KING, individually and on behalf of TINMAN | Case No. **3-26CV0226-K** |
| | *(to be filled in by the Clerk's Office)* |
| *Plaintiff(s)* | |
| *(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | Jury Trial: *(check one)* ☑ Yes ☐ No |
| -v- | |
| See attachment A | |
| *Defendant(s)* | |
| *(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)* | |

## COMPLAINT FOR A CIVIL CASE

### I.    The Parties to This Complaint

#### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

| | |
|---|---|
| Name | Erick King |
| Street Address | 14181 Noel RD |
| City and County | Dallas, Dallas County |
| State and Zip Code | Texas, 75254 |
| Telephone Number | 469-834-4688 |
| E-mail Address | eking@tinmanmto.com |

#### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title *(if known)*. Attach additional pages if needed.

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case - TXND (Rev. 9/25)

Defendant No. 1

| | |
|---|---|
| Name | City of Dallas,Texas |
| Job or Title *(if known)* | Municipal Corporation |
| Street Address | 1500 Marilla Street |
| City and County | Dallas, Dallas County |
| State and Zip Code | Texas 75201 |
| Telephone Number | 214 670 4054 |
| E-mail Address *(if known)* | NA |

Defendant No. 2

| | |
|---|---|
| Name | Crystal Ross |
| Job or Title *(if known)* | Deputy Director, Dallas Parks and Recreation Department |
| Street Address | 1500 Marilla Street, 6CN |
| City and County | Dallas, Dallas County |
| State and Zip Code | Texas 75201 |
| Telephone Number | 214 670 8958 |
| E-mail Address *(if known)* | crystal.ross@dallas.gov |

Defendant No. 3

| | |
|---|---|
| Name | John Jenkins |
| Job or Title *(if known)* | Director, Dallas Parks and Recreation Department |
| Street Address | 1500 Marilla Street, 6CN |
| City and County | Dallas, Dallas County |
| State and Zip Code | Texas 75201 |
| Telephone Number | 214 670 4100 |
| E-mail Address *(if known)* | john.jenkins@dallas.gov |

Defendant No. 4

| | |
|---|---|
| Name | |
| Job or Title *(if known)* | |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address *(if known)* | |

Pro Se 1 (Rev. 12/16) Complaint for a Civil Case - TXND (Rev. 9/25)

## II.  Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

☑ Federal question                    ☐ Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

### A.   If the Basis for Jurisdiction Is a Federal Question

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

U.S. Constitution, Fourteenth Amendment, Equal Protection Clause
U.S. Constitution, Fourteenth Amendment, Due Process Clause (Procedural and Substantive)

### B.   If the Basis for Jurisdiction Is Diversity of Citizenship

1.   The Plaintiff(s)

   a.   If the plaintiff is an individual

   The plaintiff,  *(name)* _____ , is a citizen of the
   State of *(name)* _____ .

   b.   If the plaintiff is a corporation

   The plaintiff,  *(name)* _____ , is incorporated
   under the laws of the State of *(name)* _____ ,
   and has its principal place of business in the State of *(name)*
   _____ .

   *(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.   The Defendant(s)

   a.   If the defendant is an individual

   The defendant,  *(name)* _____ , is a citizen of
   the State of *(name)* _____ . Or is a citizen of
   *(foreign nation)* _____ .

Page 3 of  5

b.    If the defendant is a corporation

The defendant, *(name)* _____ , is incorporated under

the laws of the State of *(name)* _____ , and has its

principal place of business in the State of *(name)* _____ .

Or is incorporated under the laws of *(foreign nation)* _____ ,

and has its principal place of business in *(name)* _____ .

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

3.    The Amount in Controversy

The amount in controversy–the amount the plaintiff claims the defendant owes or the amount at stake–is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III.   Statement of Claim

Write a short and plain statement of the claim. Do not make legal arguments. State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

See Attachment A - Detailed Statement of Claims, which is incorporated herein by reference.
Brief Summary:
Plaintiff, a minority entrepreneur, alleges systematic exclusion from partnership consideration by the City of Dallas Parks and Recreation Department over nine months despite professional outreach, written promises, and a comprehensive zero-cost proposal. During this period, Defendants maintained contracts with a non-minority company whose CEO was federally indicted. Plaintiff alleges violations of equal protection, due process, and the City's M/WBE policy.

## IV.   Relief

State briefly and precisely what damages or other relief the plaintiff asks the court to order. Do not make legal arguments. Include any basis for claiming that the wrongs alleged are continuing at the present time. Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts. Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

See Attachment A, Section VI (Prayer for Relief), incorporated herein.
Plaintiff seeks:
1. Declaratory relief declaring constitutional violations;
2. Injunctive relief requiring fair proposal review;
3. Compensatory damages for lost opportunities, economic harm, and emotional distress;
4. Punitive damages against individual defendants;

5. Costs and attorney's fees under 42 U.S.C. § 1988;
6. Other relief as the Court deems proper.

## V.     Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.     For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case–related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:          01/29/2026

Signature of Plaintiff

Printed Name of Plaintiff          Erick King

### B.     For Attorneys

Date of signing:

Signature of Attorney

Printed Name of Attorney

Bar Number

Name of Law Firm

Street Address

State and Zip Code

Telephone Number

E-mail Address

Print          Save As...          Add Attachment          Reset

# ATTACHMENT A

Defendant(s)

**CITY OF DALLAS, TEXAS; CRYSTAL ROSS, in her official capacity as Deputy Director of Dallas Parks and Recreation; JOHN JENKINS, in his official capacity as Director of Dallas Parks and Recreation,**
**Defendants.**

---

DETAILED STATEMENT OF CLAIMS

IV. FACTUAL ALLEGATIONS

A. TinMan's Proposal: Zero Cost, High Benefit

    1.   TinMan is a mobile automotive service network that provides vehicle maintenance and repair services at public venues including parks, recreation centers, stadiums, convention centers, and cultural facilities.

    2.   TinMan's business model is designed to benefit municipalities with zero financial risk:
- No capital investment required from the City
- No infrastructure or construction needed
- No operational burden on City staff
- Zero cost to the City
- Zero liability to the City (TinMan carries comprehensive insurance)

    1.   Instead of costing the City money, TinMan pays the City a revenue share of approximately $3.00 per service

order completed at City facilities, creating a new recurring revenue stream for participating venues.

    2.   TinMan's operations create high-quality, well-paying jobs for local residents:

    ·   Technicians average 37.5 flagged labor hours per week

    ·   Technicians earn approximately $100,000 annually

    ·   Jobs are in skilled trades protected from automation and AI disruption

    ·   Positions are specifically accessible to minority and underserved communities

    1.   TinMan's proposal directly advances the workforce development and economic inclusion goals articulated in Dallas's Business Inclusion and Development Policy and citywide equity initiatives.

    2.   TinMan brings convenience and value to City residents by providing vehicle services where they already are—at parks, recreation centers, and events—eliminating the need for separate trips and addressing a documented need (64% of drivers delay necessary vehicle maintenance).

    3.   Plaintiff developed a comprehensive 30-document proposal detailing:

    ·   Business model and operations

    ·   Financial projections and revenue sharing

    ·   Job creation estimates

    ·   Insurance and liability protections

    ·   Pilot program structure

    ·   Community impact analysis

    1.   Plaintiff proposed a low-risk, six-month pilot program with a budget capped at $99,999—deliberately structured below the $100,000 threshold requiring Dallas City Council approval, placing it within managerial approval authority.

2.   The pilot would operate at 3-5 high-traffic Dallas Parks and Recreation facilities, require no City infrastructure, and provide full reporting and oversight to City management.

B. Eight Months of Systematic Obstruction

1.   Beginning in or around April 2025, Plaintiff initiated contact with the Dallas Parks and Recreation Department to propose the TinMan public-private partnership.

2.   Over the following eight months (April 2025 - December 2025), Plaintiff made more than two dozen documented attempts to engage with City officials through multiple channels:
· Phone calls to department staff
· Emails to leadership and staff
· Communications with the Office of Procurement Services
· Attempts to attend and participate in Parks Board meetings
· Contact with the Board Secretary
· Outreach to his City Council district representative
· Contact with the City's general help hotline
· Outreach to business support organizations

1.   Plaintiff spoke extensively with Phill Foster, who held a position such as temporary Chief of Staff or similar senior role under Deputy Director Crystal Ross.

2.   Mr. Foster engaged with Plaintiff on approximately 20 to 30 occasions over a period of several months, discussing the TinMan proposal in detail.

3.   Mr. Foster was consistently responsive and professional in these interactions, indicating he understood

Plaintiff's proposal and acknowledged Plaintiff's respectful and persistent approach.

4.   Then, without explanation, Mr. Foster suddenly stopped answering Plaintiff's calls entirely—a pattern suggesting he was instructed by superiors to cease communication with Plaintiff.

5.   Plaintiff also had multiple communications with Toya Pointer, Secretary to the Parks and Recreation Board.

6.   Ms. Pointer initially responded to Plaintiff's inquiries but later ceased responding entirely, further evidencing a coordinated effort to exclude Plaintiff.

7.   On or about October 2025, Plaintiff sent Deputy Director Crystal Ross a revised proposal addressing concerns she had previously raised regarding liability, environmental impact, and operational logistics.

8.   Plaintiff's revised proposal included partnerships with private parking operators, comprehensive insurance coverage (Garage Keepers Liability, General Liability, Commercial Auto, Workers' Compensation), body cameras for service providers, dash cams with GPS and speed tracking, and on-site private security—demonstrating Plaintiff's responsiveness to concerns and commitment to transparency and safety.

9.   On or about October 2025, Deputy Director Crystal Ross responded via email:
"Thank you for sending the revised approach to your business model. While I am still uncertain of the alignment of this service to our Department's core service, I will schedule a time in the coming weeks for you to virtually present this proposal to a few members of our team."

1.   Ms. Ross continued:

"Please anticipate a call/email from my Executive Assistant Kim Franklin. I am taking time off next week; therefore this meeting will occur sometime in early November."

1.  Ms. Ross also instructed Plaintiff to contact the Office of Procurement Services:
"I connected with the Office of Procurement Services and it was recommended that you submit your inquiry to askprocurement@dallascityhall.com… From there, they will be able to provide feedback and direction."

1.  These statements constituted clear, written commitments from a senior City official acting in her official capacity:
    ·  A promise to schedule a presentation meeting
    ·  A specific timeframe (early November)
    ·  An explicit instruction to expect contact from her Executive Assistant
    ·  Direction to contact Procurement for formal guidance

1.  Plaintiff immediately responded to Ms. Ross, expressing his availability and gratitude:
"Great! I'll be on the lookout for your email."

1.  Executive Assistant Kim Franklin then contacted Plaintiff, asking for his availability:
"Please give me dates/times that works for you in November and I will check Crystal's calendar."

1.  Plaintiff promptly responded with his availability:
"Monday, Wednesday, and Friday in the mornings. However I can adjust it as necessary, to best fit her availability."

1.  Ms. Franklin never responded. No meeting was scheduled. No explanation was provided.

2.   In November 2025, Plaintiff followed up via email:
"Hello Kimberly, I am following up about the meeting
scheduled for early this month. Are you guys still
available?"

1.   No response was ever received from Ms. Franklin or
Ms. Ross.

2.   Following Ms. Ross's instruction, Plaintiff also
sent a detailed email to the Office of Procurement Services
at askprocurement@dallascityhall.com, explaining:
   ·   TinMan's business model and public benefit
   ·   Full insurance coverage with City listed as
additional insured
   ·   That TinMan would pay the City (not vice versa)
   ·   Job creation in AI-protected trades
   ·   Request for guidance on vendor registration and
procurement pathways

1.   The Office of Procurement Services never
responded.

2.   Plaintiff attempted to attend Parks and Recreation
Board meetings virtually on at least three separate
occasions.

3.   On multiple occasions, the audio was unavailable,
effectively preventing Plaintiff from participating in
public comment or observing proceedings relevant to his
proposal.

4.   Plaintiff observed Mr. Foster attending at least
one Board meeting remotely, confirming that meetings were
occurring—but Plaintiff was unable to participate due to
technical barriers.

5.   Throughout this nine-month period, Plaintiff maintained a professional, respectful, and persistent approach. He:
· Followed every instruction given by City officials
· Provided requested information promptly
· Made himself available and flexible for meetings
· Submitted formal written proposals
· Attempted to engage through every available channel

1.   Despite these exhaustive good-faith efforts, Plaintiff was never afforded an opportunity to present his proposal to decision-makers or receive substantive feedback.

2.   The pattern of conduct—explicit promises followed by silence, responsive staff suddenly going silent, non-functional meeting access, and coordinated non-responsiveness across multiple officials—evidences a systematic and intentional effort to exclude Plaintiff.

C. Disparate Treatment: The Oak View Group Comparison

1.   During the same period that Defendants systematically excluded Plaintiff from consideration, the Dallas Parks and Recreation Department maintained active contractual relationships with Oak View Group (OVG), a non-minority-owned company.

2.   OVG's relationship with Dallas Parks was plagued by serious misconduct, financial malfeasance, and operational failures:

3.   In June 2025, OVG's Chief Executive Officer was indicted by federal authorities for bid-rigging and anti-competitive conduct in connection with public contracts.

4.    Investigations revealed that OVG had misallocated approximately $5.7 million in donor funds that were intended for Fair Park improvements and public benefit.

5.    OVG owed approximately $6 million to vendors for work performed at Fair Park and other City facilities, leaving many small businesses unpaid for extended periods.

6.    OVG's management of Fair Park was marked by chronic maintenance failures, unpaid utility bills creating risk of service interruptions, and widespread operational mismanagement.

7.    OVG had entered into a federal non-prosecution agreement related to anti-competitive conduct, acknowledging wrongdoing in exchange for deferred prosecution.

8.    In September 2025, the City of Dallas terminated OVG's contract for Fair Park management due to these failures, acknowledging the company's inability to fulfill its contractual obligations.

9.    Despite this termination for cause, OVG continues to manage the Kay Bailey Hutchison Convention Center for Dallas Parks and Recreation as of the date of this Complaint.

10.    The contrast between Defendants' treatment of OVG and Plaintiff is stark and telling:
OVG (Non-Minority Owned):
  ·    Federal criminal indictment of CEO
  ·    $5.7 million in misallocated funds
  ·    $6 million owed to vendors
  ·    Chronic operational failures
  ·    Terminated for cause
  ·    Yet retains City contracts
TinMan (Minority-Owned):
  ·    Zero cost to City

- Zero liability to City
- Revenue-generating for City
- Job-creating for minority communities
- Professional 30-document proposal
- Aligns with City's stated priorities
- Yet denied even basic consideration

1.    This disparate treatment—maintaining relationships with a scandal-plagued, criminally-charged non-minority contractor while systematically excluding a beneficial minority-owned proposal—has no legitimate, non-discriminatory explanation.

D. Public Statements Show Perfect Alignment—Yet Still Rejected

1.    During the period of Plaintiff's proposal and outreach, Director John Jenkins and Deputy Director Ryan O'Connor made numerous public statements expressing the Department's desire for exactly the type of partnership Plaintiff proposed.

2.    These officials publicly stated they were actively seeking:
- Partners for Fair Park activation and programming
- Revenue-generating public-private partnerships
- "Private sector experts" to activate City venues
- Innovative programming at City facilities
- Partnerships for retail, restaurant, and service offerings at venues

1.    The timing and substance of these public statements overlap directly with Plaintiff's proposal period (2025).

2.    Plaintiff's TinMan proposal directly addresses every single stated priority:

·      Mobile service platform that activates venues
(parks, rec centers, Fair Park, etc.)

·      Revenue-generating (City receives payment per
service)

·      Private sector innovation (mobile automotive
service model)

·      Enhanced visitor experience (convenient service
while attending events/programs)

·      No cost or burden to City

1.     Despite this perfect alignment between Plaintiff's
proposal and the Department's publicly stated needs,
Defendants refused to consider Plaintiff's proposal or even
meet with him.

2.     This contradiction—publicly seeking partnerships
while privately rejecting a perfectly aligned
proposal—supports an inference that Defendants' stated
reasons for non-engagement were pretextual.

E. Violation of Dallas's Business Inclusion and Development
(BID) Policy

1.     The City of Dallas has adopted a Business
Inclusion and Development (BID) Policy codified in municipal
regulations and procurement policies.

2.     The BID Policy explicitly states:
"It is the policy of the City of Dallas to involve certified
Minority and Women-Owned Business Enterprises (M/WBEs) to
the greatest extent feasible on the City's construction,
general services, and professional services contracts."

1.     The BID Policy further mandates:
"The City and its contractors shall not discriminate on the
basis of race, age, color, ancestry, national origin, place
of birth, religion, sex, sexual orientation, gender identity
and expression, military or veteran status, genetic

characteristics, or disability unrelated to job performance in the award and performance of contracts."

1.   The BID Policy applies to all contracts for goods or services over $50,000. Plaintiff's proposal qualifies.

2.   The BID Policy establishes specific M/WBE participation goals, including 38% for professional services contracts.

3.   Plaintiff's proposal would provide 100% M/WBE participation—far exceeding the City's stated goal.

4.   The BID Policy requires the City's Business and Workforce Inclusion (BWI) division to perform specific functions, including:
·    "Conduct outreach functions to communicate contracting and procurement opportunities and procedures"
·    "Explain Business Inclusion and Development compliance procedures"
·    "Encourage prime and subcontracting relationships"
·    "Communicate the City's M/WBE goals and Business Inclusion and Development requirements"
·    "Maintain and distribute a directory of certified and registered M/WBEs"

1.   Defendants violated every procedural requirement of the BID Policy in their treatment of Plaintiff:
·    They failed to conduct outreach or facilitate communication about the partnership opportunity
·    They failed to explain procedures—Procurement never responded to Plaintiff's inquiry
·    They failed to encourage the partnership despite perfect policy alignment
·    They denied equal opportunity through systematic obstruction and broken promises

1.   The BID Policy includes provisions to assist small and emerging M/WBE businesses, including: "Provide education and assistance services related to starting, maintaining, and growing a business through the Broadening Urban Investment to Leverage Dallas (B.U.I.L.D.) ecosystem"

1.   Plaintiff, as a minority entrepreneur from an underserved community operating a family business, represents precisely the type of small business the BID Policy and B.U.I.L.D. program exist to support.

2.   However, Plaintiff could not afford the $270 fee required for formal M/WBE certification through the North Central Texas Regional Certification Agency (NCTRCA), Dallas Fort Worth Minority Supplier Diversity Council (DFWMSDC), or Women Business Council-Southwest (WBC).

3.   The irony is profound and revealing: The BID Policy exists specifically to help small minority-owned businesses like Plaintiff's succeed. Yet the financial barrier to certification—combined with Defendants' refusal to provide any assistance, outreach, or even basic engagement—effectively excluded Plaintiff from consideration for a partnership that would cost the City nothing and advance the very goals the policy seeks to achieve.

4.   Rather than assisting Plaintiff in navigating the certification process, providing guidance on partnership pathways, or considering his proposal on its merits given its obvious alignment with City goals, Defendants simply ignored him.

5.   This treatment stands in stark contrast to the extensive support, patience, and continued partnership extended to OVG despite that company's failures, misconduct, and criminal charges.

**F. Exhaustion of Remedies and Damages**

1.   Plaintiff has exhausted all available administrative and informal remedies.

2.   Over eight months, Plaintiff contacted or attempted to contact:
- Deputy Director Crystal Ross
- Director John Jenkins
- Temporary Chief of Staff (or equivalent) Phill Foster (20-30 times)
- Executive Assistant Kim Franklin
- Board Secretary Toya Pointer
- Office of Procurement Services
- His City Council district representative
- City help hotline
- Dallas Black Chamber of Commerce
- Greater Dallas Hispanic Chamber of Commerce

1.   Plaintiff followed every instruction given by City officials, submitted formal proposals, attempted to attend public meetings, and maintained professional communication throughout.

2.   No administrative appeals process exists for partnership proposals that are simply ignored rather than formally denied.

3.   As a direct and proximate result of Defendants' conduct, Plaintiff has suffered damages including:
- Lost business opportunity: Plaintiff's financial projections show his pilot program would have generated substantial revenue and established TinMan's presence in the Dallas market, leading to expansion opportunities
- Economic harm: Eight months of time, effort, and resources invested in pursuing this partnership without return

- Reputational harm: Being systematically excluded and ignored by a major municipal department affects Plaintiff's credibility and business prospects
- Emotional distress: The frustration, humiliation, and anxiety of being treated dismissively despite professional, persistent, and respectful efforts
- Lost momentum: Inability to execute the pilot program during the proposed timeframe has delayed business development and expansion

1. These damages are ongoing as Defendants continue to refuse engagement with Plaintiff's proposal.

---

## V. CLAIMS FOR RELIEF

COUNT I: Violation of Equal Protection Clause of the Fourteenth Amendment (42 U.S.C. § 1983)

1. Plaintiff incorporates by reference all preceding allegations as if fully set forth herein.

2. The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits state actors from denying any person equal protection of the laws.

3. The Equal Protection Clause prohibits government officials from intentionally discriminating against individuals on the basis of race or treating similarly situated persons differently without legitimate justification.

4. Defendants, acting under color of state law, intentionally treated Plaintiff differently than similarly situated non-minority businesses without any legitimate, non-discriminatory justification.

5.   Defendants maintained and continue to maintain contractual relationships with Oak View Group (OVG), a non-minority-owned company, despite:
    ·   Federal indictment of OVG's CEO for bid-rigging
    ·   Misallocation of $5.7 million in public/donor funds
    ·   $6 million owed to vendors
    ·   Chronic operational failures and mismanagement
    ·   Termination of one contract for cause

1.   Simultaneously, Defendants systematically excluded Plaintiff, a minority entrepreneur, from consideration despite:
    ·   A professional, comprehensive 30-document proposal
    ·   Zero cost and zero liability to the City
    ·   Revenue generation for the City
    ·   Substantial job creation in minority communities
    ·   Perfect alignment with the City's stated priorities and M/WBE goals

1.   The stark disparity in treatment—rewarding a scandal-plagued non-minority contractor with continued business while denying even basic consideration to a beneficial minority proposal—supports a strong inference of discriminatory intent or, at minimum, discriminatory effect arising from deliberate indifference.

2.   No legitimate, non-discriminatory reason exists for this disparate treatment.

3.   Defendants' actions were intentional, deliberate, and motivated by discriminatory animus or deliberate indifference to Plaintiff's rights.

4.   Defendants' conduct violated Plaintiff's clearly established constitutional right to equal protection of the laws.

5.    As a direct and proximate result of Defendants'
unconstitutional conduct, Plaintiff has suffered and
continues to suffer damages including lost business
opportunities, economic harm, reputational injury, and
emotional distress.

COUNT II: Violation of Procedural Due Process Clause of the
Fourteenth Amendment (42 U.S.C. § 1983)

1.    Plaintiff incorporates by reference all preceding
allegations.

2.    The Due Process Clause of the Fourteenth Amendment
prohibits state actors from depriving persons of liberty or
property without due process of law.

3.    Plaintiff had a legitimate claim of entitlement to
fair consideration of his proposal under:
·    The City's Business Inclusion and Development
(BID) Policy, which mandates M/WBE involvement "to the
greatest extent feasible" and requires specific outreach and
procedural protections
·    Standard municipal procurement procedures
requiring good-faith consideration of qualifying proposals
·    The explicit written commitments made by Deputy
Director Crystal Ross in her official capacity

4.    Deputy Director Crystal Ross, acting under color
of state law, made clear, unequivocal written commitments
that created a legitimate expectation of process:
·    "I will schedule a time in the coming weeks for
you to virtually present this proposal"
·    "Please anticipate a call/email from my Executive
Assistant Kim Franklin"
·    "This meeting will occur sometime in early
November"
·    Direction to contact Procurement for "feedback and
direction"

5.    These commitments were made by a senior official with authority over partnership decisions, in her official capacity, and in response to Plaintiff's formal proposal submission.

6.    A reasonable person in Plaintiff's position would understand these statements as official commitments creating an entitlement to the promised process.

7.    Defendants denied Plaintiff this process through systematic obstruction and broken promises:
·    No meeting was ever scheduled despite Executive Assistant Franklin's request for Plaintiff's availability
·    No response was provided to Plaintiff's November follow-up inquiry
·    Procurement never responded to Plaintiff's inquiry as directed by Ms. Ross
·    Virtual meeting access was obstructed through technical failures
·    Staff who had been responsive suddenly ceased all communication

8.    Plaintiff was denied any meaningful opportunity to be heard, to present his proposal to decision-makers, or to receive substantive feedback on his submissions.

9.    The process Plaintiff received was arbitrary, capricious, and bore no rational relationship to any legitimate government purpose.

10.    Defendants' conduct violated clearly established procedural due process protections.

11.    As a direct and proximate result, Plaintiff has suffered damages including lost business opportunities, economic harm, and emotional distress.

COUNT III: Violation of Substantive Due Process (42 U.S.C. § 1983)

1.   Plaintiff incorporates by reference all preceding allegations.

2.   The Due Process Clause protects individuals from arbitrary and irrational government action that shocks the conscience.

3.   Defendants' conduct in this case shocks the conscience and constitutes arbitrary, irrational government action:
     ·   Ignoring a zero-cost, revenue-generating, job-creating proposal for eight months
     ·   Making explicit written promises and then ghosting a minority entrepreneur
     ·   Maintaining contracts with a company whose CEO faces federal criminal charges while excluding a beneficial minority proposal
     ·   Publicly stating a desire for partnerships while privately rejecting a perfectly aligned proposal
     ·   Systematically obstructing a small business owner's attempts to participate in the public contracting process

4.   This conduct is not merely negligent or mistaken—it reflects deliberate indifference to Plaintiff's rights and constitutes arbitrary government action lacking any rational basis.

5.   Plaintiff has a substantive due process right to be free from such arbitrary and conscience-shocking government conduct.

6.   As a direct and proximate result, Plaintiff has suffered damages including lost business opportunities, economic harm, reputational injury, and emotional distress.

**COUNT IV: Violation of City of Dallas Business Inclusion and Development (BID) Policy**

1.    Plaintiff incorporates by reference all preceding allegations.

2.    The City of Dallas has enacted a Business Inclusion and Development Policy establishing mandatory procedures and protections for M/WBE participation in City contracts.

3.    The BID Policy creates enforceable obligations and procedural protections for minority-owned businesses seeking to do business with the City.

4.    Plaintiff's proposal falls within the scope of the BID Policy as a proposed partnership for services at City facilities valued over $50,000.

5.    Defendants violated multiple mandatory requirements of the BID Policy, including but not limited to:
·    Failure to conduct required outreach to communicate partnership opportunities
·    Failure to explain BID compliance procedures as requested
·    Failure to encourage prime and subcontracting relationships
·    Failure to provide equal opportunity for M/WBE participation
·    Discrimination against Plaintiff on the basis of race/minority status

6.    These violations were willful, systematic, and resulted in Plaintiff's complete exclusion from the partnership process.

7.    Defendants' violations of the BID Policy constitute breaches of official duty and deprivation of rights under color of municipal law.

8.    As a direct and proximate result, Plaintiff has suffered damages including lost business opportunities and economic harm.

COUNT V: Breach of Implied Contract

1.    Plaintiff incorporates by reference all preceding allegations.

2.    When Plaintiff submitted his comprehensive proposal to Dallas Parks and Recreation, and particularly when Deputy Director Crystal Ross promised to schedule a presentation meeting and directed Plaintiff to contact Procurement for guidance, an implied contract was formed.

3.    Under this implied contract, Defendants were obligated to:
·    Consider Plaintiff's proposal in good faith
·    Provide the promised presentation opportunity
·    Respond to inquiries submitted to Procurement as directed
·    Follow standard procedures for evaluating partnership proposals

4.    Plaintiff performed his obligations under this implied contract by:
·    Submitting a comprehensive, professional proposal
·    Providing all requested information
·    Making himself available for meetings
·    Following all instructions from City officials
·    Contacting Procurement as directed

5.    Defendants breached this implied contract by:
·    Failing to schedule the promised meeting

· Failing to respond to Plaintiff's inquiries

· Failing to provide any substantive consideration of the proposal

· Systematically obstructing Plaintiff's attempts to engage

6. As a direct and proximate result of this breach, Plaintiff has suffered damages including lost business opportunities and economic harm.

COUNT VI: Promissory Estoppel

1. Plaintiff incorporates by reference all preceding allegations.

2. Deputy Director Crystal Ross made clear and definite promises to Plaintiff:

· "I will schedule a time in the coming weeks for you to virtually present this proposal"

· "Please anticipate a call/email from my Executive Assistant Kim Franklin"

· "This meeting will occur sometime in early November"

3. Ms. Ross made these promises in her official capacity, knowing Plaintiff would rely on them.

4. Plaintiff reasonably and foreseeably relied on these promises by:

· Providing his availability for the promised meeting

· Waiting for contact from Ms. Franklin as promised

· Following Ms. Ross's direction to contact Procurement

· Refraining from pursuing alternative strategies in expectation of the promised meeting

· Investing additional time and resources in preparing for the presentation

5.    Plaintiff's reliance was reasonable given that these promises came from a senior City official in her official capacity in response to a formal business proposal.

6.    Plaintiff suffered substantial detriment as a result of his reliance, including:
·    Lost time and opportunity during the period he waited for the promised meeting
·    Lost momentum in business development
·    Continued investment of resources in the Dallas partnership pathway
·    Foregoing alternative business opportunities

7.    Injustice can be avoided only by enforcing Defendants' promises.

8.    Defendants are estopped from denying their obligation to provide Plaintiff the promised presentation opportunity and fair consideration.

COUNT VII: Intentional Infliction of Emotional Distress

1.    Plaintiff incorporates by reference all preceding allegations.

2.    Defendants engaged in extreme and outrageous conduct by:
·    Systematically ignoring a minority entrepreneur's professional, persistent outreach over eight months
·    Making explicit written promises and then ghosting Plaintiff entirely
·    Obstructing Plaintiff's attempts to participate in public meetings
·    Coordinating staff to cease communication with Plaintiff
·    Maintaining relationships with a scandal-plagued contractor while excluding Plaintiff's beneficial proposal

3.    This conduct exceeds all bounds of decency tolerated in a civilized society and is utterly intolerable in a properly functioning government.

4.    Defendants knew or should have known that their conduct would cause Plaintiff severe emotional distress, particularly given:
·    The systematic nature of the obstruction
·    The broken promises and sudden silence
·    The contrast with treatment of non-minority contractors
·    Plaintiff's status as a small minority business owner trying to succeed

5.    As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including frustration, humiliation, anxiety, and feelings of helplessness and discrimination.

6.    This emotional distress is ongoing as Defendants continue to refuse engagement.

COUNT VIII: Negligent Infliction of Emotional Distress

1.    Plaintiff incorporates by reference all preceding allegations.

2.    Alternatively, even if Defendants' conduct was not intentional, Defendants owed Plaintiff a duty of care in handling his proposal and communications given:
·    The official nature of their interactions
·    The explicit commitments made by senior officials
·    The BID Policy's mandate for fair treatment of M/WBE businesses
·    Standard professional norms for government-business interactions

3.     Defendants breached this duty of care through their systematic obstruction, broken promises, and complete failure to provide even basic courtesy or communication.

4.     This breach of duty was negligent and fell below the standard of care expected of reasonable government officials.

5.     Defendants knew or should have known that their conduct would foreseeably cause Plaintiff emotional distress.

6.     As a direct and proximate result, Plaintiff suffered emotional distress as described above.

---

**VI. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff ERICK KING respectfully requests that this Honorable Court grant the following relief:

**A. DECLARATORY RELIEF**

1.     Declare that Defendants violated Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment;

2.     Declare that Defendants violated Plaintiff's rights under the Procedural Due Process Clause of the Fourteenth Amendment;

3.     Declare that Defendants violated Plaintiff's rights under the Substantive Due Process Clause of the Fourteenth Amendment;

4.    Declare that Defendants violated the City of Dallas Business Inclusion and Development (BID) Policy;

B. INJUNCTIVE RELIEF

1.    Issue a preliminary and permanent injunction requiring Defendants to:

a. Review and consider Plaintiff's TinMan proposal in good faith within 30 days;

b. Provide Plaintiff with a fair opportunity to present his proposal to decision-makers;

c. Provide Plaintiff with a substantive written response addressing the merits of his proposal;

d. Implement procedures to ensure future M/WBE proposals receive fair, timely consideration in compliance with the BID Policy;

e. Provide training to Dallas Parks and Recreation staff on BID Policy compliance and constitutional obligations regarding equal treatment;

C. COMPENSATORY DAMAGES

1.    Award Plaintiff compensatory damages for:

a. Lost business opportunities and economic harm;

b. Reputational injury;

c. Emotional distress, humiliation, and mental anguish;

d. Time and resources invested in pursuing the partnership;

e. All other economic and non-economic damages proven at trial;

**D. PUNITIVE DAMAGES**

    1.   Award Plaintiff punitive damages against individual Defendants CRYSTAL ROSS and JOHN JENKINS in their individual capacities for their willful, intentional, malicious, and conscience-shocking violations of Plaintiff's constitutional rights;

**E. COSTS AND FEES**

    1.   Award Plaintiff his costs of suit, including reasonable attorney's fees under 42 U.S.C. § 1988;

**F. OTHER RELIEF**

    1.   Grant such other and further relief as the Court deems just, proper, and equitable.

---

**DEMAND FOR JURY TRIAL**
Plaintiff demands a trial by jury on all issues so triable.

---

**VERIFICATION**
I, ERICK KING, declare under penalty of perjury that I have read the foregoing Complaint and that the facts stated therein are true and correct to the best of my knowledge, information, and belief.
Executed on: January 29, 2026

_____

**ERICK KING**

**EXHIBIT LIST**

The following exhibits are attached and incorporated by reference:

**EXHIBIT A:** Call log showing 100+ documented contact attempts

**EXHIBIT B:** Email correspondence with Crystal Ross, Kim Franklin, Office of Procurement Services, and more

**EXHIBIT C:** TinMan proposal documents

**EXHIBIT D:** OVG news articles and public records

**EXHIBIT E:** City of Dallas BID Policy

**EXHIBIT F:** Public statements by Jenkins and O'Connor

**EXHIBIT A**



EXhibit A

Call Log





































| | | | |
|---|---|---|---|
| **AG** | **Ahmad Goree**<br>↗ phone | 10/1/25 | ⓘ |
| **BW** | **Brett Wulke**<br>↗ phone (2) | 10/1/25 | ⓘ |
| **AG** | **Ahmad Goree**<br>↗ phone (3) | 10/1/25 | ⓘ |
| **PF** | **Phil Foster**<br>↗ phone | 10/1/25 | ⓘ |
| **AG** | **Ahmad Goree**<br>↗ phone | 10/1/25 | ⓘ |
| **BW** | **Brett Wulke**<br>↗ phone | 10/1/25 | ⓘ |
| ● | **(214) 670-3326**<br>↗ Dallas, TX | 10/1/25 | ⓘ |
| **PF** | **Phil Foster**<br>↗ phone | 10/1/25 | ⓘ |











**EXHIBIT B**



| | | |
|---|---|---|
| **OM** | Omar.Narvaez@dallas.gov; Mar... | 4/16/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Dear Council Member Narvaez, I hope ... | Sent Items |
| **TP** | tennell.atkins@dallascityhall.co... | 4/16/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Dear Council Member Atkins, I hope th... | Sent Items |
| **EK** | Erick King | 4/16/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Dear Council Member Atkins, I hop... | Deleted Items |
| **EK** | Erick King | 4/16/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Dear Council Member Atkins, I hop... | Deleted Items |
| **EK** | Erick King | 4/16/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Dear Council Member Atkins, I hop... | Deleted Items |
| **EK** | Erick King | 4/16/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Dear Council Member Atkins, I hop... | Deleted Items |

Exhibit B

Email Evidence



eking@tinmanmto.com — 4/25/2025
City of Dallas BEH Meet and Greet Follow Up — 2
Hello Kevin, It was a pleasure to m... — Deleted Items

OPS Admin — 4/21/2025
To Schedule a Meet and Greet - City of Dallas - ...
Good afternoon, To schedule a Vendor Mee... — Inbox

Chad.West@dallas.gov; ashley.l... — 4/16/2025
Strategic Partnership Opportunity for City-Own...
Dear Council Member West, I hope thi... — Sent Items

katherine.stewart@dallas.gov; ... — 4/16/2025
Strategic Partnership Opportunity for City-Own...
Dear Council Member Stewart, I hope ... — Sent Items

paul.ridley@dallas.gov; max.sa... — 4/16/2025
Strategic Partnership Opportunity for City-Own...
Dear Council Member Ridley, I hope th... — Sent Items

Bazaldua, Adam — 4/16/2025
Strategic Partnership Opportunity for City-... — 1
Hello! Thank you for reaching out to me. Du... — Inbox

| C | **christopher.murray@dallas.gov** | 5/6/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Hello Mr. Murray(Assistant Director of... | **Sent Items** |

| MS | **Mail Delivery System** | 5/6/2025 |
| | Strategic Partnership Opportunity for City-O... ⟲ | |
| | X-Area1Security-Disposition: BOUN... | **Deleted Items** |

| C | **christopher.murray@dallas.gov** | 5/6/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Hello Mr. Murray(Assistant Director of... | **Sent Items** |

| MN | **martine.philippe@dallas.gov; gl...** | 4/25/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Dear Office of Art & Culture, I hope thi... | **Sent Items** |

| RJ | **rosa.fleming@dallas.gov; regin...** | 4/25/2025 |
| | Strategic Partnership Opportunity for City-Own... | |
| | Dear Office of Convention and Event S... | **Sent Items** |

| KC | **Kevin Crampton** | 4/25/2025 |
| | City of Dallas BEH Meet and Greet Follow Up | |
| | Hello Kevin, It was a pleasure to meet ... | **Sent Items** |





PP  phil.foster@dallascityhall.com; ...    7/3/2025
Automotive Pilot Proposal Packet
King, Erick    Sent Items

PP  phil.foster@dallascityhall.com; ...    7/2/2025
Automotive Pilot Proposal
King, Erick    Sent Items

PP  phil.foster@dallascityhall.com; ...    7/1/2025
Automotive Pilot Proposal
King, Erick    Sent Items

C   cynthia.palacios@dallas.gov    7/1/2025
Pilot Proposal
King, Erick    Sent Items

MS  Mail Delivery System    6/25/2025
Pilot Prososal
X-Area1Security-Disposition: BOUNCE-DELI...    Inbox

C   cynthia.palacils@dallas.gov    6/25/2025
Pilot Prososal
Hello Cynthia, We're a Dallas-based co...    Sent Items







G **glynn.newman@dallas.gov**                              7/16/2025
Follow-Up: Dallas Parks & Recreation Pilot Prop...
Dear Dr. Newman, I hope this note find...   Sent Items

E **eking@tinmanmto.com**                                7/16/2025
Follow-Up: Dallas Parks & Recreation Pilot Prop...
Dear Dr. Newman, I hope this note ...   Deleted Items

LH **Lepeska, Heather**                                  7/10/2025
Incentive Inquiry – TinMan Local Hiring Pilot    2
Hi Erick— Thanks for reaching out. We don't...   Inbox

E **eking@tinmanmto.com**                                7/10/2025
Incentive Inquiry – TinMan Local Hiring Pilot
Dear Ms. Lepeska, I'm Erick King, f...   Deleted Items

E **eking@tinmanmto.com**                                7/10/2025
Incentive Inquiry – TinMan Local Hiring Pilot
Dear Ms. Lepeska, I'm Erick King, f...   Deleted Items

E **eking@tinmanmto.com**                                7/10/2025
Incentive Inquiry – TinMan Local Hiring Pilot
Dear Ms. Lepeska, I'm Erick King, f...   Deleted Items



**E**    eking@tinmanmto.com                              9/15/2025
Proposal Submission – TinMan Onsite Vehi...  🖉
Hello Ahmad, Thank you again for t...   Deleted Items

**B**    brett.wulke@dallas.gov                          9/9/2025
Follow-up & Partnership Summary – TinMa...  🖉
Hello Brett, Thank you for returning m...   Sent Items

**RG**   Rosa Gallegos                                   9/4/2025
Follow-Up on TinMan Pilot Proposal (Via P...  5
Hello Ms. Gallegos, I wanted to follow ...   Sent Items

**RG**   Rosa Gallegos                                   8/18/2025
Follow-Up on TinMan Pilot Proposal (Via Phil F...
Dear Miss Gallegos, Thank you for you...   Sent Items

**J**    john.jenkins@dallas.gov                         7/28/2025
Pilot Proposal Referral from Dr. Newman – ...  🖉
Dear Director Jenkins, I hope this mes...   Sent Items

**EK**   Erick King                                      7/28/2025
Pilot Proposal Referral from Dr. Newman – ...  🖉
Dear Director Jenkins, I hope this ...   Deleted Items

**CR** Crystal Ross; martine.philippe...    12/8/2025
Notice — TinMan Operational Plan & Public Dep...
Dear Members of the City of Dallas Offi.    Sent Items

**E** eking@tinmanmto.com    12/8/2025
Notice — TinMan Operational Plan & Public Dep...
Dear Members of the City of Dallas...    Deleted Items

**FK** Franklin, Kimberly    11/25/2025
Enhancing Visitor Experience at City Venue...    5
Thank you for your email. I am currently out...    Inbox

**CR** Crystal Ross    10/17/2025
Enhancing Visitor Experience at City Venues — ...
Great! I'll be on the lookout for your e...    Sent Items

**O** opsadmin@dallas.gov    9/30/2025
Proposal Submission — TinMan Onsite V...    2
King, Erick Begin forwarded message: ...    Sent Items

**A** ahmad.goree@dallas.gov    9/15/2025
Proposal Submission — TinMan Onsite Vehi...
Hello Ahmad, Thank you again for taking th...    Drafts





To: Erick King
To: crystal.ross@dallas.cityhall.com
The 1/15/2025 9:00 AM

Hi Idon Ross,

I wanted to share an updated approach that directly addresses the concerns you raised regarding liability, environmental impact, and operational logistics — while still enhancing the visitor experience at city-owned venues.

In this version, TinMan would collaborate directly with Parking Systems of America (PSA) to offer a personalized valet option for event guests. Visitors would be met by a TinMan porter at the venue entrance, and their vehicle would be taken to a nearby PSA lot for service. Each service provider will be equipped with a body camera, and the TinMan will utilize private security at each service lot for security. Dash cams with speed tracking would be used for full transparency during transportation, and TinMan would carry complete operational insurance, ensuring zero liability for the City:

- Garage Keepers Liability
- Generally Liability
- Commercial Auto
- Workers compensation

*City Dallas can also be listed as an Additional Insured

The benefits are substantial:

- Convenient drop-off and pick-up for families, seniors, and guests with health concerns.
- Reduced congestion at venue entrances and improved traffic flow.
- An enhanced, premium arrival experience that reflects positively on Dallas and its facilities.

Even without a formal pilot, I believe this concept could be a meaningful addition to the visitor experience. If the City would be open to simply highlighting the service on venue websites or entry signage—similar to how Uber or Lyft pickup points are displayed—it would go a long way in supporting accessibility and convenience for guests.

If I'm able to secure PSA's participation, would the Parks and Recreation Department be open to a short test period or informational listing to gauge visitor response?

Thank you for your time and continued consideration. I'd be happy to discuss details or coordinate a brief call at your convenience.

Best regards,

Erick King
TinMan CEO

*TinMan*

Direct: (+1) 469-834-4108
Email: EKing@TinManNTS.com
Website: http://www.TinManNTS.com

RC   **Ross, Crystal**
To: Erick King; Franklin, Kimberly
Fri 10/17/2025 10:57 AM

...

Good Morning Mr. King

Thank you for sending the revised approach to your business model. While I am still uncertain of the alignment of this service to our Department's core service, I will schedule a time in the coming weeks for you to virtually present this proposal to a few members of our team.

In the interim, I connected with the Office of Procurement Services and it was recommended that you submit your inquiry to askprocurement@dallascityhall.com.  To learn more about conducting business with the City. From there, they will be able to provide feedback and direction.

Please anticipate a call/email from my Executive Assistant Kim Franklin. I am taking time off next week; therefore this meeting will occur sometime in early November.

I look forward to connecting with you and learning more about your business proposal.
Crystal



**Crystal R. Ross**
Senior Deputy Director

Dallas Park and Recreation
Department
10031 E. Northwest Hwy
Dallas, TX 75238
O: 214.670.8847
Crystal.ross@dallas.gov
-

Dallas
Park & Recreation

...                                                



7:34

outlook.office.com

**Franklin, Kimberly**
To: Erick King; Franklin, Kimberly
Fri 10/24/2025 9:42 AM

Good Morning Erick,

I hope this communication finds you well. Please give me dates/times that works for you in November and I will check Crystal's calendar. Thank you

**Kimberly Franklin, MBA**
*Executive Assistant*





7:35

outlook.office.com

**Erick King**
To: Kimberly Franklin
Tue 11/25/2025 3:19 PM

Hello Kimberly,
I am following up about the meeting scheduled for early this month. Are you guys still available?
Best regards,

Erick King

TinMan, CEO

Outlook-xztxy20a.png

**Direct: (+1) 469-834-4688**
**Email: EKing@TinManMTO.com**
**Website: http://www.TinManMTO.com**

On Oct 24, 2025, at 9:42 AM, Franklin,



7:35

outlook.office.com

**Enhancing Visitor Experience at City Venues – TinMan Personal Valet Concept**

**FK**  Franklin, Kimberly
To: Erick King
Tue 11/25/2025 3:20 PM

Thank you for your email. I am currently out of the office and have limited access to email. I will respond to all message when I return.

**EK**  Erick King                    Tue 11/25/2025 3:19 PM
Hello Kimberly, I am following up about the me...

**EK**  Erick King                    Fri 10/24/2025 3:00 PM
Monday, Wednesday, and Friday in the morning...

**Inquiry Regarding Vendor Engagement – TinMan Vehicle Service Pilot**

Erick King
To: askprocurement@dallascityhall.com
Tue 10/21/2025 7:44 AM

Dear Office of Procurement Services,

I was referred to your office by Ms. Crystal Ross with the Dallas Parks and Recreation Department regarding next steps for conducting business with the City.

My company, TinMan, is developing a visitor-focused vehicle care program designed for city-owned venues. The concept aims to enhance guest experience and accessibility by offering valet-assisted maintenance through a partnership with private lot owners.

Each operation would be fully insured (Garage Keepers Liability, General Liability, Commercial Auto, and Workers' Compensation), with the City of Dallas listed as an additional insured. Security measures include on-site private personnel, body cameras, and dash cams with GPS/speed tracking for full transparency.

Importantly, the City does not pay TinMan — TinMan pays the City. Our goal is to operate as a public enhancement partner, providing a self-sustaining service that delivers measurable community benefits, including local job creation in AI-protected trades and positive economic impact across Dallas venues.

I'm reaching out to determine:

1. Whether this type of service would require registration as a City vendor or another specific procurement pathway.

2. If so, what documentation or prequalification steps would be necessary to proceed.

3. Whether there is an appropriate contract vehicle, pilot process, or cooperative arrangement that could allow TinMan to demonstrate the model at select city venues.

I'd appreciate your guidance or direction to the appropriate contact within Procurement who manages service vendor engagement for city facilities.

Thank you for your time and assistance.

Best regards,
Erick King
TinMan, CEO



**Direct:** (+1) 469-834-4688
**Email:** EKing@TinManMTO.com
**Website:** http://www.TinManMTO.com

↩ ˅   Reply

# TinMan Pilot Executive Summary

TinMan is a mobile automotive service network designed to deliver convenience, job creation, and revenue generation directly at city-owned venues. We respectfully propose a 6-month pilot program, funded at $99,999, to demonstrate the impact of onsite vehicle maintenance at high-traffic Dallas Parks & Recreation sites.

TinMan projects 544-640 service orders during the active service period. This volume supports the creation of multiple skilled technician roles, generates recurring revenue for city venues, and validates service demand for long-term deployment.

- **4** Facilities X **8** Service Orders X **17** Weeks = **544** Service Orders
- **4** Facilities X **8** Service Orders X **20** Weeks = **640** Service Orders

## Pilot Scope
- Total Stipend: $99,999 (below Council threshold)

- Duration: 6 Months

- Setup: 6–8 weeks from funding date
- Service Period: 2-6 Months

- Coverage: 3–5 scheduled-entry Parks & Rec venues

- Oversight: Weekly updates and dashboards provided to City Manager and Parks Department

## Key Benefits
- Creates skilled jobs for underserved Dallas residents

- Brings convenient, cost-effective service to public venues

- Generates a new revenue stream for each host facility

- Requires no construction, city staff, or capital investment

*Exhibit*

*C—1*

*Pilot Executive Summary*

## Implementation Timeline Overview
TinMan is ready for immediate activation upon stipend approval. We welcome the opportunity to brief City leadership and host site teams to initiate rollout.

Join us in our pursuit of people.

Weeks 1–2: Technician onboarding and ordering of signage/materials

Weeks 2–4: Venue coordination, setup, and staff training

Week 5–6: Awareness campaign and marketing rollout

Month 2–6: Pilot service period with full reporting and city updates

Exhibit C-2

Job creation
1
3
Economic Impact

# TinMan: Job Creation & Economic Impact

In Pursuit of People

---

**TinMan proposes a high-impact partnership with city governments to deliver mobile automotive services at public venues.**

We create good-paying jobs, generate revenue for cities, and meet residents where they are — literally.

---

## Model Assumptions

| Metric | Value |
|---|---|
| Target Flag Hours per Technician | 37.5 hrs/week (1,950 hrs/year) |
| Avg. Labor Hours per Service Order | 2.5 hrs (adjusted from 3.79 for scale) |
| Service Orders per Technician (Annual) | 1,950 ÷ 2.5 = 780 orders |
| Labor Revenue per Hour | $71.28 |
| Revenue per Tech (Labor only) | 1,950 × $71.28 = $138,996 |
| City Revenue Share per Job | $3.00 (conservative estimate) |

## Job Creation Model

- 1 Technician per 780 service orders annually

- 1 Service Advisor per 10-15 Technicians

- Each Technician generates $138,996 in labor value

- All jobs are protected trades, accessible to minority & underserved groups

## Sample Projections by City

| City | Orders/Year | Technicians | Advisors | City Revenue |
|------|-------------|-------------|----------|--------------|
| **Dallas** | 2,500 | 3–4 | 1 | $7,500 |
| **Fort Worth** | 2,000 | 3 | 1 | $6,000 |
| **Arlington** | 1,500 | 2 | 1 | $4,500 |
| **Irving** | 1,200 | 2 | 1 | $3,600 |
| **Plano** | 1,000 | 1–2 | 1 | $3,000 |

## Revenue Share Model

Cities earn $3.00(minimum) per job initiated at their facilities — creating a new recurring stream to reinvest in local departments, from Parks to Economic Development.

**Workforce Value**

TinMan technicians average 37.5 flagged labor hours/week, translating into earnings of ~$100,000 per year. For cities, each of these skilled trade roles reflects a local economic impact of $69,000–$139,000 per technician annually.

These are jobs protected from automation and AI — accessible to underrepresented communities and purpose-built to meet local service demand.

# The Need: Why Cities Must Act

There are over 7.8 million registered vehicles across the Dallas-Fort Worth metroplex — more than the population of 35 U.S. states. But while the market is large, the gaps in vehicle care are even larger:

- 64% of drivers are currently putting off some form of vehicle maintenance

- 69% say they delay service even when they know it's due

- 46% have paid for avoidable repairs due to skipped maintenance

- 58% say they cannot afford a $1,000 emergency repair today

## Pilot-Ready

TinMan is prepared to launch a low-risk, 6-month pilot at 3–5 high-traffic city locations — no infrastructure required, capped at $50K–$100K, under manager-level approval thresholds.

This pilot tackles that challenge head-on — delivering convenience, trust, and affordability where residents already are: parks, rec centers, event venues, museums, and more.

**Bottom Line**

For every 780 service orders completed, TinMan creates one full-time, AI resistant, skilled career — rooted in convenience, equity, and innovation.

With TinMan, cities gain a mobile, workforce-first public service that generates new jobs, new revenue, and a better guest experience — all without building a single structure.

From stadiums to rec centers to cultural hubs, we're transforming how cities serve their people — one service order at a time.

Exhibit C-3

Circle of
   Benefits

## Host Process Step by Step

1. *Bulk Service Reservation received(cut off 5-7 days, for Large organized events(LOE 14 days))*
2. *Export CSV to Microsoft Sheets*
3. *Properly categorize & prepare for entry into database*
4. *Schedule material pickup from Walmart(Preferred Partnership)*
5. *Verify guest arrival close to service date*
6. *Pickup box truck from rental partner and obtain material from Walmart*
   - *Park at/near service area in preparation for services*
7. *Valet vehicle(owner/car rental) to designated service area*
8. *Render services*
9. *Create Service Record*
10. *Send Payment Link*
11. **Dispose of materials appropriately**

## Service Options(Simple)

1. *Oil Change:*
   - *Duration: 0.5*
   - *Labor Revenue: $35.64*
2. *Oil change +:*
   - *Duration: 1.5*
   - *Labor Revenue: $106.92*
3. *Diagnostic:*
   - *Duration: 1*
   - *Labor Revenue: $71.28*

**Shop Rate: $71.28**

## Factors

- *How many guests*
- *Average duration of stay*
- *Host service preferences*

# Circle of Benefits



*Circle of Benefis on back →*

## Host Circle of benefits

### Vehicle Owner(Guest):

- *Enhance guest experience*
  - ○ *Visitors get more value out of their visit without disrupting their plans.*
- *Convenient/cost effective vehicle services*

### Host(Facility):

- *Expanded service offerings*
- *New revenue opportunity*
  - ○ *Each parking spot can generate an estimated $142.56 – $1,140 per day or nearly $3,500 – $27,500 per month in service revenue. The city/venue operator(host) receive a percentage of this monthly revenue.*
  - ○ *All services originating from Host Facilities/Venues*
- *Staffing Burden:*
  - ○ *Zero operational lift is required from host or management partners.*
- *No Liability:*
  - ○ *Indemnification/Hold Harmful Clauses*
- *Now Taxpayer Cost*
  - ○ *TinMan pays the host a portion of the service revenue. **Hosts have no financial obligation**.*

### Municipalities:

- *Job Creation:*
  - ○ *This program potentially creates thousands of well-paying, blue-collar jobs—particularly for minorities—within an industry that is resilient to AI disruption and centered around hands-on, skilled service work.*
  - ○ *Starting at $51(hourly)*
  - ○ *Support MWBE Entrepreneurs(techs or otherwise)*
- *Technology:*
  - ○ *Showing interest in innovation*
  - ○ *Opportunity for Dallas to become a leader in the push towards technology; over Austin, and different from San Francisco.*
  - ○ *Highlights DFW's willingness to embrace tech innovators*

### TinMan:

- *Address the common issue of convenience*
- *Exposure from performing services at facilities/venues where many people visit*
- *Incentivize contractors to perform light maintenance and diagnostics*



















**Reservation Location**

Host*

| Please Select ▼ |

**Guest Information**

Full Name*

Email*

Number*

| United States +1 ▼ |

Reservation Date*

Reservation Time*

Additional Notes: [Any special requests or details]

-------------------FOR HANDLER/HOST USE ONLY-------------------

Rep. Name:

Rep. Email:

Rep. Number:

| United States +1 ▼ |

**Submit**

Exhibit C-4

Governance
|
?
|
Oversight

# Governance & Oversight Framework

Ensuring Accountability, Transparency, and Partnership Integrity

To maintain trust and operational excellence, TinMan will implement a comprehensive governance and oversight structure as part of its partnership with the City. This framework ensures full transparency around how public funds are used and how community impact is measured.

## Key Oversight Components

1. Quarterly Financial & Impact Reporting

   - Detailed breakdown of operating stipend expenditures

   - Job creation updates (number of hires, roles, certifications)

   - Service delivery data: locations, number of vehicles serviced, service types

   - Revenue share summaries by host department

2. City Liaison Coordination

   - Designated TinMan operations lead available for monthly check-ins

   - Quarterly coordination calls or in-person reviews with city staff

   - Optional standing invite to city's internal stakeholder review meetings

3. Real-Time Operational Transparency

   - City departments provided access to reports
   - Technician locations (if permitted), facility utilization, and customer feedback

   - Available in summary form for monthly inclusion in internal reports

4. Standards & Safeguards

   - Full documentation of insurance coverage, technician vetting, and safety protocols

   - Body camera usage and vehicle protection procedures

   - Waste and site-cleanliness standards in coordination with host venue or lot management

5. Annual Review & Renewal

- At 12 months, city staff and TinMan leadership will evaluate the partnership using a predefined rubric
- Feedback will inform renewal terms, stipend adjustments, or expanded deployment

This governance structure provides proactive accountability and ensures that TinMan remains aligned with the City's goals, financial policies, and community commitments.

Exhibit C-5

M.O.U.

# Memorandum of Understanding (MOU)

Between TinManT.M.O.C., LLC and [City Name]

For a 6-Month Vehicle Service Pilot Program

This Memorandum of Understanding (MOU) sets forth the terms and understanding between TinManT.M.O.C., LLC ("TinMan") and the City of [City Name] ("the City") for the implementation of a 6-month pilot program delivering on-site automotive services at select city-owned facilities.

## 1. Purpose

The purpose of this MOU is to launch a time-bound public-private pilot program providing convenient, mobile vehicle maintenance services to the public at designated City locations, while supporting workforce development, guest experience, and municipal innovation.

## 2. Scope of Services

TinMan will:

- Deploy mobile automotive technicians to 3–5 City facilities, such as recreation centers, libraries, or event venues.

- Offer services including diagnostics, oil changes, and general maintenance.

- Coordinate scheduling and reporting in alignment with City staff.

- Submit monthly reports detailing:

  - Number of vehicles serviced

  - Jobs created

  - Revenue share owed to the City

## 3. Pilot Timeline

- Start Date: TBD

- End Date: TBD

- Total duration: 6 months from launch.

## 4. Compensation and Revenue Sharing

- The City agrees to allocate up to $[insert amount] (not to exceed $99,999) for the pilot, payable under professional services.

- TinMan will share $3.00 per job(minimum) conducted at City facilities back to the originating department (e.g., Parks & Rec, Convention Services).

## 5. Roles & Responsibilities

| TinMan Responsibilities | City Responsibilities |
|---|---|
| Provide insured mobile technicians | Designate 3–5 facility sites for deployment |
| Deliver monthly job and hiring reports | Support communication with onsite staff |
| Coordinate reschedules and follow-ups | Evaluate pilot outcomes jointly with TinMan |

## 6. Termination

Either party may terminate this MOU with 15 days' written notice, with final payment prorated to work performed.

---

## 7. Non-Binding and Good Faith

This MOU is a non-binding agreement reflecting a good-faith intention to collaborate. A formal services agreement may be developed after pilot evaluation.

---

## 8. Contact Information

TinManT.M.O.C., LLC

Erick King, Founder

eking@tinmanmto.com

(xxx) xxx-xxxx

City of [City Name]

[Contact Name or Department]

[Email Address]

[Phone Number]

---

## 9. Signatures

City of [City Name]

By: _____

Title: _____

Date: _____

TinManT.M.O.C., LLC

By: Erick King, Founder

Date: _____

Exhibit D-1

ADVERTISEMENT



NEWS | POLITICS

# Oak View Group CEO accused of rigging bidding process to run UT Austin arena

The venue management company is responsible for running Dallas' Kay Bailey Hutchison Convention Center and the city just dropped the operator's contract to run Fair Park.



By **Devyani Chhetri**
City Reporter

Jul. 9, 2025 | Updated 6:23 p.m. CDT | ⏱ 2 min. read





Moody Center on the campus of the University of Texas at Austin is pictured with the UT Tower and Darrell K Royal-Texas Memorial Stadium at dusk in on Wednesday, June 8, 2022, in Austin.

SMILEY N. POOL / STAFF PHOTOGRAPHER



Oak View Group CEO Tim Leiweke, whose company currently oversees Dallas' Kay Bailey Hutchison Convention Center and was up until recently responsible for day-to-day operations at Fair Park, was indicted by a federal jury after being accused of rigging the bidding process for a sports arena at the University of Texas in Austin.

The U.S. Department of Justice's antitrust division announced the indictment Wednesday, and alleged that between 2018 and 2024, Leiweke conspired with the top executive of a

competitor to rig the bidding to manage and use the $338 million Moody Center arena.



Assistant Attorney General Abigail Slater said Leiweke conspired to "benefit his own company and deprived a public university and taxpayers of the benefits of competitive bidding."

A spokesperson for Leiweke said the embattled CEO had "done nothing wrong and will vigorously defend himself and his well-deserved reputation for fairness and integrity."

**Political Points**

Get the latest politics news from North Texas and beyond.

Email Address

**SIGN UP**

Or with:    G  GOOGLE

By signing up, you agree to our Terms of Service and Privacy Policy.

"The Antitrust Division's allegations are wrong on the law and the facts, and the case should never have been brought," the statement said. "The law is clear: vertical, complementary business partnerships, like the one contemplated between OVG and Legends, are legal," adding that the allegations seek to criminalize "common teaming efforts."

Meanwhile, the Oak View Group released its own statement.

"Oak View Group cooperated fully with the

Antitrust Division's inquiry and is pleased to have resolved this matter with no charges filed against OVG and no admission of fault or wrongdoing," the company said.



ADVERTISEMENT

The indictment states Leiweke tried to get a competing venue-services company to back down from bidding against Oak View Group by offering the competitor potential subcontracts. In the end, Oak View Group was the sole applicant.

"Public contracts are subject to laws requiring an open and competitive bid process to ensure a

level playing field," Assistant Director in Charge Christopher G. Raia of the FBI New York Field Office said in a news statement.

OVG and Legends Hospitality, which has corporate offices in Frisco, agreed to pay $15 million and $1.5 million in penalties, respectively.

"We support all efforts to ensure a fair and competitive environment in our industry and are committed to upholding industry-leading compliance and disclosure practices," OVG's statement said.



ADVERTISEMENT

"We are proud of the partnerships we've built, and remain committed to continuing to offer exceptional hospitality and holistic venue management solutions and venue development expertise which deliver value to our venue partners, fellow service providers, and the communities and customers we serve."

In 2019, Dallas handed the keys to the convention center to Spectra, which the Oak View Group later acquired.

The same venue management company also took over Fair Park and has been embroiled in controversy over the misspending of $5.7 million in donor funds. Recently, the city terminated its contract with the venue-management company and began a new audit to comb through the park's finances and see where city dollars and generated revenue were spent.

## Related Stories

VIEW MORE >

- **Regional Dallas Public Library model receives pushback. Here's how that plan works**

- **Dallas to begin search for new auditor amid search for another top official marches on**
- **North Texas winter storm makes driving treacherous, leaves many in the dark**



By **Devyani Chhetri**

Before joining the Dallas Morning News, Devyani Chhetri covered South Carolina politics and presidential primaries at the Greenville News. She went to Boston University for graduate school.

**MORE ABOUT:**   Dallas City Hall

## Commenting Experience Feedback

Encounter an issue with commenting? Take 2 minutes to **provide feedback** to help us improve your experience.

### Join the conversation

Thank you for reading. We welcome your thoughts on this topic. Comments are moderated for adherence to our Community Guidelines. Please read the guidelines before participating.

Exhibit D-2

Making Dallas an
Even Better Place



Jan 27, 2026
Dallas, TX
● 25° F

Menu

Subscribe  

News

# What Will Happen to Fair Park?

After a year of turmoil, Dallas Park and Recreation laid out their vision for managing Fair Park to a City Council committee—but no one could (or would) discuss a vital part of that plan.

By Dylan Duke  |  December 8, 2025  |  2:44 pm



Advertisement    X

Elizabeth Lavin



L ast week, Dallas Parks and Recreation laid out its public-private partnership management model for Fair Park to City Council members on the Parks, Trails, and Environment Committee, just as the city begins a new generation of management for its "crown jewel."

The city plans to manage the park while delegating some functions, such as security, food, and venue advertising, to private companies. "We have the right infrastructure there, it's just that, I truly believe, we have not given the necessary time and attention that Fair Park deserves, and that's why the old models don't work," Dallas Park and Recreation Director John Jenkins told the committee. "It has to be a partnership between the private sector, the city, and the surrounding community."

The city took over management of the park this September after cutting ties with the previous sub-contractor, Oak View Group (formerly known as Spectra), and the nonprofit intermediary Fair Park First. That relationship crumbled after it was revealed that OVG allegedly misappropriated $5.7 million in donations. The city also had no direct contract with OVG, which further complicated oversight. (OVG still manages another city asset: the Kay Bailey Hutchison Convention Center.)

Before the park's privatization in 2018, it was run by the city. Many at the time felt it was underutilizing the space and doing so at too high a cost. The new public-private model aims to take a hybrid approach, reaping the benefits of both models while mitigating as many of the negatives as possible.

Park officials laid out five pillars for how they're going to approach Fair Park.

They include finding ways to better utilize the successful partners at the park they already have, developing regularly occurring community events and programming that also include opportunities for small businesses near Fair Park, and encouraging nonprofits to use the park and facilities in the hopes that they become operating partners over time. Officials also said they hope to "aggressively" pursue additional large events and other opportunities for the park.

That all amounts to a lot of 'economic development,' which is city-speak for investing heavily to attract businesses. Park and Recreation Deputy Director Ryan O' Connor told the committee he hopes to have contracts with the City of Dallas Economic Development Corporation ready by early 2026.

**Neighborhood Spotlight**

Image

### South Dallas - Fair Park

The first thing you need to understand is that the neighborhood's name, South Dallas, is a misnomer. It sits predominantly east, rather than south, of downtown. The second thing to understand is that, despite the disrepair into which much of this historic corner of the city fell in recent decades, there are residents here passionately committed to forging a strong sense of community.

"This economic development arm has to be the driver [...]" Jenkins said. "That is our key component, and we have never looked at it that way at Fair Park."

## What did city council members say?

At the top of most council members' concerns was the briefing itself. The

agenda had been structured so that the committee members couldn't ask how the promised Community Park–a green space that would replace parking spaces in Fair Park–would be built and managed, since it was initially the responsibility of Fair Park First.

"I'm tired of the way things are being put on an agenda that gags us," Bazaldua said. "We've got major business in the city that we need to discuss, and I don't like it being parceled and siloed out for us to not actually get to the elephant in the room."

Fair Park First secured a $3 million donation for the Community Park just this June and has raised more than $30 million in total, leaving them just $6 million shy of their fundraising goal. But that funding is in limbo now that the city has formally ended its contract with Fair Park First after the fallout with OVG. City officials have pointed out that the cash is tied to Fair Park First, and that not working with them would mean securing a deal with another nonprofit to restart the fundraising process.

However, some on the Park and Recreation board (a group of residents appointed to oversee the city's portfolio of parks and recreation facilities) have voiced a desire to remain cautious, taking a wait-and-see approach. They'd like to review a full audit of the nonprofit's spending and funding before jumping into another contract with the nonprofit.

Advertisement

While the Community Park was not mentioned in the presentation, Jenkins said it plays a vital role in the revitalization of Fair Park. The conversation around the Community Park is especially sensitive given it's seen as an effort to undo some of the damage caused when homes owned by the Black community in South Dallas were razed and removed with eminent domain to

expand Fair Park in the 1960s. Councilmember Paul Ridley also echoed support for the Community Park.

"I was surprised that it was not included–not even mentioned–in this presentation, because it not only is something that the community wants, it's something that would constitute an investment in attracting economic development in that vicinity," he said.

As for the actual presentation from Parks and Rec executives, committee members were hungry for more specifics. "This presentation is what you want to do — can you tell us what you're doing now to fulfill any of the opportunities and promises you've already provided?" Councilmember Lorie Blair said. O'Connor told the committee a "very detailed plan and timeline" would be ready "probably early second quarter of next year."

## What happens next for Fair Park?

Park and Rec will focus on what they call "low-hanging fruit." This includes throwing more festivals at Fair Park (Ridley suggested a Christmas event), hosting family-friendly events at the Leonhardt Lagoon Nature Walk, and focusing on forming a committee to manage the Cotton Bowl. Officials also said they are currently securing short-term contracts for security on the park premises and reviewing older contracts. They'll then begin looking at longer-term contracts that will hand over venue advertising to private partners.

Bazaldua requested that future conversations include the full council and the city manager. "I don't ever want to have a Fair Park presentation that doesn't include the city manager to talk about how any of the plans you're bringing forward is going to also include work from their office to get it done," he said. "We've got to stop the siloed approach, or any of these plans are not going to be successful."

## Author



**Dylan Duke**
View Profile ⟶

Fair Park

Image

## 📰 Get the D Brief Newsletter

Dallas' most important news stories of the week, delivered to your inbox each Sunday.

Email*

Sign Up

## What do you think?

28 Responses



EXhibit D-3

 



# Fair Park's back under city control — and Dallas wants to make it profitable

**KERA | By Megan Cardona**

Published October 9, 2025 at 3:09 PM CDT

  





*Philip Lange / Shutterstock*

The city of Dallas officially took over operations at Fair Park in September after canceling its contract with Fair Park First and Oak View Group.

Dallas Park and Recreation is exploring ways to make historic Fair Park profitable after seven years of, what city leaders call, "lost time."

The city officially took over the park's operations in mid-September after ending its contract with the nonprofit Fair Park First and its for-profit partner group Oak View Group earlier this year.

Now the city has its work cut out for it, with a lengthy list of deferred maintenance and missed event opportunities that could have taken place at the park.

During Thursday's Park and Recreation Board meeting, Ryan O'Connor, deputy director of Dallas Park and Recreation, emphasized collaboration with partner groups, community events, and utilizing Fair Park's large, 277-acre campus as potential ways to increase funding.

Part of that revitalization plan includes reviewing and modifying existing contracts and securing new tenants for vacant buildings.

O'Connor also said they want the Dallas Economic Development Corporation to initiate an economic development study in partnership with local chambers of commerce and surrounding business associations near Fair Park.

"We want to make sure everyone is working together so that Fair Park can be what we all want it to be," O'Connor said.

Park and Recreation Director John Jenkins said he considered the revitalization of Fair Park as "very high level" because they're making up for lost time. He contributed problems from the last seven years — since the Fair Park First and OVG contract was created — to governance, execution, and failure to maintain the park grounds.

Jenkins said Fair Park will not succeed without including its surrounding community in South Dallas.

"If we don't reconnect with the surrounding community, we will fail," he said.

## Fair Park fallout

Fair Park First and its partnership with then-management group Spectra Venue Management were established in 2018 to improve the management and operations of Fair Park, which lost money when run solely by the city of Dallas, KERA previously reported.

Fair Park First was created to fundraise for the park and preserve its history. Spectra was brought in to manage the finances and daily operations of the park.

However, none of the people who created the partnership were calling the shots seven years later.

Spectra was later acquired by Oak View Group. Fair Park First had new leadership since it was established, and city officials who approved the original contract no longer hold office.

An independent audit released last year revealed Fair Park First had misallocated $5.7 million out of the total $17 million in restricted donor funds managed by Oak View Group between Oct. 1, 2020 and April 30, 2024. The funds — meant for specific purposes — were still spent on Fair Park, but were used for park operations and unqualified projects outside of their intended purpose.

Details of the audit resulted in finger-pointing between the two groups because the contract gave no specifics on who was at fault if something went wrong.

Although the contract has ended, Fair Park First still exists.

Fair Park First is scheduled to appear before the Park and Recreation Board in November to move forward with a memorandum of understanding with the city concerning the community park.

Veletta Forsythe-Lill, Fair Park First immediate past chair, told KERA that the non-profit has raised $33 million of the $39 million needed for the project and plans to break ground after the FIFA World Cup in 2026.

*Got a tip? Email Megan Cardona at [mcardona@kera.org](mailto:mcardona@kera.org).*

*KERA News is made possible through the generosity of our members. If you find this reporting valuable, consider making a tax-deductible gift today. Thank you!*

**Tags**  | Government | | Government Accountability | | City of Dallas |

| Fair Park | | city parks |





### Megan Cardona

Megan Cardona is the Dallas Accountability Reporter for KERA News, covering city government and issues impacting Dallas residents. She was born and raised in the Dallas-Fort Worth area and previously worked at the Fort Worth Star-Telegram.

**See stories by Megan Cardona**

Exhibit D-4

Watch Live

# Dallas Park Department pushes for year-round activation of Fair Park

By Lori Brown | Published  October 9, 2025 6:21pm CDT  | Fair Park  | FOX 4  | ➤

**Dallas Parks calls previous years at Fair Park 'Lost'**

After seven "lost" years under private control, the City of Dallas has resur management of Fair Park with a goal to activate the space year-round by retail, hotels, and sports opportunities.

**The Brief**

- Dallas has taken back management of Fair Park after seven years under a privat that the city's Parks Director called "lost."

- The city's main goal is to activate Fair Park year-round with new hotels, restaura and more sports opportunities.

- City officials are considering moving the location of a long-planned park inside F to a spot closer to the African American Museum.

---

**DALLAS** - The City of Dallas is back in the driver's seat at Fair Park after s years under private management.

Today, the director of the Dallas Park department called those years "losi

## The New Vision: Year-Round Activation

What we know: The Dallas Parks director, John Jenkins, wants to activate I with hotels, restaurants, and retailers, and he said they ai working to attract certain sports opportunities.

While Fair Park is bustling this week with the State Fair of Texas, the rest year it remains empty real estate. That's despite promises made seven ye by the private management group Spectra, which later became Oak View

Now the Dallas Parks Department is back in charge.

"We have been waiting too long for consistent activities at Fair Park," said

"Only one objective, activate Fair Park year round, and we feel like we lost years."

## Cotton Bowl's $3 Million vs. Rose Bowl's $54 Million

What they're saying: Jenkins also compares the Cotton Bowl to another ic venue: The Rose Bowl.

"The Rose Bowl, I like to call it the twin of the Cotton Bowl," he said.

"They're both almost 100 years old. They both seat 92,000 folks. The diffe they bring in 54 million a year in revenue."

Jenkins says, by comparison, the Cotton Bowl brings in a fraction of that, a year at best.

"They are bringing in hundreds of events each year. They have figured ou model we should adopt," he said.

## A Push to Move Locations

Local perspective: Park board member Scott Goldstein suggested now co the time to reconsider the location of the long-planne inside Fair Park, which would go near Dos Equis Pavilic

"Threw out the idea of moving the park to a more logical place, like origin talked about years ago, closer to the music hall and African American mu said Goldstein.

It's an idea supported by park board member Earnest Slaughter.

"I grew up over there, we are still in the back of the bus. If it were moved the African Museum and Music Hall, that way the community would have said Slaughter.

"Entrance and exit over there, it is like an expressway."

The other side: Jenkins indicated the current proposed location could col development.

"Let's just say we're trying to attract certain sports opportunities at Fair P may make sense to have the park with retail and sports in the same area Jenkins.



## Groundbreaking Still Set for August 2026

What's next: Fair Park has 60 acres of possible land. Jenkins pledged the
still on schedule.

Groundbreaking for the park is set for just 10 months from now, in Augu

**The Source:** Information in this article was provided by the Dallas Park
Recreation Board meeting on October 9, 2025.

**Fair Park**   **Dallas**   **Dallas County**   **State Fair of Texas**



This material may not be published, broadcast, rewritten, or redistributed. ©2026 FOX Television Stations

EXhibit E
_____

Bid policy



**City of Dallas**

## Exhibit A

## Business Inclusion and Development Policy

### Business Inclusion and Development (BID) Policy Statement

It is the policy of the City of Dallas to involve certified Minority and Women-Owned Business Enterprises (M/WBEs) to the greatest extent feasible on the City's construction, general services, and professional services contracts. It is the policy of the City of Dallas to encourage the growth and development of M/WBEs that can successfully compete for contracting opportunities. The City and its contractors shall not discriminate on the basis of race, age, color, ancestry, national origin, place of birth, religion, sex, sexual orientation, gender identity and expression, military or veteran status, genetic characteristics, or disability unrelated to job performance in the award and performance of contracts. In consideration of this policy, the City of Dallas has adopted the Business Inclusion and Development (BID) Policy for all City of Dallas contracts.

### Scope of BID Policy

The BID Policy shall apply to all contracts for the purchase of goods or services over $50,000 with special emphasis on those contracts with first tier subcontracting opportunities. The provision of the BID Policy takes precedence over any departmental plans or procedures in conflict herewith, except for specific requirements mandated by the terms or conditions of agreements in force between the City and the Federal Government or the State of Texas that require different procedures than those described in the BID Policy.

### BID Policy Objectives

The objectives of the BID Policy are to:

- promote inclusion of M/WBEs by providing equal opportunity for participating in City construction, general services and professional services contracts

- provide procedures for monitoring, enforcement, and compliance with M/WBE requirements

- provide conditions for growth and development of M/WBEs by providing training and access to business resources and opportunities

- promote diverse competition through marketing initiatives on all City contracts for the purchase of goods or services over $50,000

### Administration of the BID Policy

The City Manager will take all usual and legal administrative actions necessary to implement the BID Policy and is ultimately responsible for the administration of the BID Policy.

The City Manager is designated to serve as the City's M/WBE Liaison Officer for the BID Policy. The Liaison Officer is responsible for implementing, coordinating, and managing the BID Policy. The M/WBE Liaison Officer has designated the Business and Workforce Inclusion (BWI) division of the Office of Economic Development to be responsible for the following:

- Developing, managing, implementing, and evaluating the BID Policy

- Disseminating information related to business opportunities

- Maintaining and providing a directory of certified* M/WBE vendors

- Maintaining and providing a directory of registered City of Dallas vendors

- Tracking and monitoring M/WBE participation including subcontractor utilization with emphasis on subcontractor utilization post council award

- Tracking and monitoring payments to prime contractors from the City and payments from prime contractors to subcontractors with emphasis on prompt payment as outlined in Government Code Section 2251.022

- Granting evaluation points to encourage a meaningful inclusion of M/WBE participation in response to proposals estimated to be more than $250,000.

- Advising prospective contractors/proposers on Business Inclusion and Development compliance requirements

- Communicating M/WBE goals and BID compliance requirements

- Maintaining and submitting accurate and current reports on M/WBE performance

- Providing opportunities for networking among contractors and firms

- Creating programs that build the capacity of M/WBEs

- Creating programs that result in diverse competition on City contracts

* The City of Dallas is a member of the North Central Texas Regional Certification Agency (NCTRCA), Dallas Fort Worth Minority Supplier Diversity Council (DFWMSDC), and Women Business Council-Southwest (WBC).

**BID Policy Procedures to Ensure Equal Opportunity**

BWI will facilitate participation of M/WBEs in construction, general services and professional services contracts. To ensure compliance with the BID Policy, at a minimum, BWI will:

- Conduct outreach functions to communicate contracting and procurement opportunities and procedures

- Provide education and assistance services related to starting, maintaining, and growing a business through the Broadening Urban Investment to Leverage Dallas (B.U.I.L.D.) ecosystem

- Explain Business Inclusion and Development compliance procedures

- Encourage prime and subcontracting relationships

- Encourage joint ventures and teaming agreements

- Communicate the City's M/WBE goals and Business Inclusion and Development requirements

- Maintain and distribute a directory of certified and registered M/WBEs

- Review Business Inclusion and Development documentation to ensure compliance with the BID Policy

- Review specifications for large contracts prior to the issuance of a request for proposal or request for a bid to determine and/or identify unbundling opportunities to increase M/WBE participation

- Review project specifications for opportunities to remove barriers and restrictive language

- Perform regular site visits based on project type, award amount or stakeholder concerns to ensure compliance with BID Policy

- Monitor compliance of prime contractors and subcontractors and recommend measures to deal with prime and sub-contractors deemed to be non-compliant with BID Policy criteria

- Develop an owner-controlled insurance policy owned by the City of Dallas

- Maintain a public sector group to provide recommendations on industry best practices focusing on new programs, small business resources, and contracting opportunities that have historically been overlooked

**BID Policy Certification of M/WBEs**

The City of Dallas is a member of the North Central Texas Regional Certification Agency (NCTRCA), Dallas Fort Worth Minority Supplier Diversity Council (DFWMSDC), and Women Business Council-Southwest (WBC). These agencies certify M/WBE ownership and control and provide M/WBE certification services for the City of Dallas. The City reserves the right to accept M/WBE certifications issued by other certifying organizations or agencies that use the same or similar certification criteria as the certification agencies listed above. Self-certification does not meet the City's M/WBE certification requirements. Dallas also recognizes Native American-owned businesses with tribal cards associated with that business as M/WBE.

**BID Policy Other Provisions**

In addition to this goal-based policy, it is the preference of the City of Dallas for the workforce of its contractors to be reflective of the diversity of the residents of the City of Dallas. In accordance with Chapter 15B of the Dallas City Code, awardees of construction contracts involving the expenditure of more than $10,000 and awardees for the procurement of goods and services involving an expenditure of more than $50,000 are required to incorporate an equal employment opportunity clause which provides that the contractor shall not discriminate against any employer or applicant for employees because of race, age, color, ancestry, national origin, place of birth, religion, sex, sexual orientation, gender identity and expression, military or veteran status, genetic characteristics, or disability unrelated to job performance. The City reserves the right to request

a contractor's affirmative action plan or equal opportunity plan. In addition, if the contractor plans to hire additional staff to complete the contract, the City reserves the right to request a local hiring plan.

The BID Policy or the diverse workforce preference is not to be construed to require the City of Dallas to award a contract to anyone other than the lowest responsible bidder or most advantageous proposer. The BID Policy is also not to be construed to require contractors/proposers to award subcontracts/sub-proposals to or make significant material purchases from M/WBEs who do not submit the lowest responsible sub-bid.

Before award of a contract, the City of Dallas will require bidders/proposers to document good faith efforts to meet established goals.

Failure to adequately document a good faith effort to obtain M/WBE participation may result in award to the next-lowest bidder or advantageous proposer.

Failure to utilize M/WBEs listed in Business Inclusion and Development forms without properly documenting and explaining the change will be deemed as non-compliant and will result in non-compliance actions and will be considered in future awards.

Upon receipt of each payment from the City of Dallas, the awarded vendor is required to report payment data in the City's contract compliance system. Sub-contractors will be prompted to confirm payment data as reported by the prime in the City's contract compliance system.

The City of Dallas maintains the option to waive BID Policy criteria where there is no opportunity or availability for M/WBE inclusion.

The City Manager's Office is responsible for procedures and processes related to the administration of this Policy.

### BID Policy Goals

| | |
|---|---|
| Construction | 32.00% |
| Architectural & Engineering | 34.00% |
| Professional Services | 38.00% |
| Other Services | N/A |
| Goods | 32.00% |

Exhibit F-1



**WATCH NOW ON WFAA+**
Texas Winter Storm: Nearly done with freezing temperatures for now | Recorded 1/26

**BREAKING NEWS**
DALLAS-FORT WORTH WINTER STORM | Live updates and weather radar from North Texas



COMMUNITY

# Dallas residents hope for Fair Park revival through '5

# Pillars' plan following the city's takeover

—

**Dallas Park and Recreation plans to revitalize Fair Park with the "5 Pillars for Fair Park" plan, focusing on community and economic growth.**

Author: Brittani Moncrease
Published: 5:43 PM CDT October 9, 2025
Updated: 5:43 PM CDT October 9, 2025

DALLAS — The memories of Fair Park feel close. However, the experience now can feel distant.

One Dallas resident who feels these memories fading is Doug Montgomery.

He took his wife to see Fair Park. She isn't from Dallas, but he wanted to show her where some of his childhood memories took place. Montgomery shared that experience with the Dallas Park and Recreation Board on Thursday.

"I told my wife about the Natural History Museum. I want her to see the museum. It was empty," said Montgomery. "I've wondered where the artifacts have gone."

Fair Park sees more than four million people a year. It's a place known for its rich culture, but now it's waiting for revival.

"We can't wait, you know, we really need to implement change now," said Ryan O'Connor, Dallas Park and Recreation deputy director.

For the first time since the city of Dallas took control over Fair Park from the Oak View Group, O'Connor and his team shared their vision for the future.

"We've got to draw large campus activations," said O'Connor.

Through their "5 Pillars for Fair Park" plan, they want to revitalize and maximize the park's potential while driving economic growth.

Part of the plan is to partner with non-profits and private companies.

"We need private experts to help us with sales, booking, marketing," said O'Connor.

The Park and Recreation Department would manage contracts and park maintenance.

"We've got to get regularly recurring and seasonal community programs that create small business opportunities for folks in the local neighborhoods," said O'Connor.

The department said they want to lean into what's already there, such as the museums, Broadway Dallas, the State Fair of Texas, and the newly renovated Cotton Bowl Stadium.

"The similarities between the Rose Bowl and the Cotton Bowl at Fair Park specifically are really remarkable, and we've been, you know, working with them to understand how they're monetizing that building," said O'Connor.

John Jenkins, Park Board Director, said there's been a failure in governance, execution, and maintenance in the past. He said that while they sort out the park's future structure, it doesn't mean they can't push for change now.

That surrounding community includes residents like Montgomery, who still has hope for Fair Park.

"With the existing infrastructure and buildings in place, I feel opportunities are many and feasible to make Fair Park a park again," Montgomery said. "It'd be a perfect community park in that area."

**⌐ Related Articles**

City of Dallas will take over Fair Park operations, terminates contract with private manager

$140 million Cotton Bowl renovation nears finish line

'It's a historical icon.' | South Dallas natives look back at 100 years of the State Fair Classic

LOADING NEXT ARTICLE...

Exhibit F-2



Making Dallas an
Even Better Place

Jan 27, 2026
Dallas, TX
● 25° F

 Menu

Subscribe  

News

# What Will Happen to Fair Park?

After a year of turmoil, Dallas Park and Recreation laid out their vision for managing Fair Park to a City Council committee—but no one could (or would) discuss a vital part of that plan.

By Dylan Duke  |  December 8, 2025  |  2:44 pm



Elizabeth Lavin



L ast week, Dallas Parks and Recreation laid out its public-private partnership management model for Fair Park to City Council members on the Parks, Trails, and Environment Committee, just as the city begins a new generation of management for its "crown jewel."

The city plans to manage the park while delegating some functions, such as security, food, and venue advertising, to private companies. "We have the right infrastructure there, it's just that, I truly believe, we have not given the necessary time and attention that Fair Park deserves, and that's why the old models don't work," Dallas Park and Recreation Director John Jenkins told the committee. "It has to be a partnership between the private sector, the city, and the surrounding community."

The city took over management of the park this September after cutting ties with the previous sub-contractor, Oak View Group (formerly known as Spectra), and the nonprofit intermediary Fair Park First. That relationship crumbled after it was revealed that OVG allegedly misappropriated $5.7 million in donations. The city also had no direct contract with OVG, which further complicated oversight. (OVG still manages another city asset: the Kay Bailey Hutchison Convention Center.)

Before the park's privatization in 2018, it was run by the city. Many at the time felt it was underutilizing the space and doing so at too high a cost. The

new public-private model aims to take a hybrid approach, reaping the benefits of both models while mitigating as many of the negatives as possible.

Park officials laid out five pillars for how they're going to approach Fair Park. They include finding ways to better utilize the successful partners at the park they already have, developing regularly occurring community events and programming that also include opportunities for small businesses near Fair Park, and encouraging nonprofits to use the park and facilities in the hopes that they become operating partners over time. Officials also said they hope to "aggressively" pursue additional large events and other opportunities for the park.

That all amounts to a lot of 'economic development,' which is city-speak for investing heavily to attract businesses. Park and Recreation Deputy Director Ryan O' Connor told the committee he hopes to have contracts with the City of Dallas Economic Development Corporation ready by early 2026.

**Neighborhood Spotlight**

Image

## South Dallas - Fair Park

The first thing you need to understand is that the neighborhood's name, South Dallas, is a misnomer. It sits predominantly east, rather than south, of downtown. The second thing to understand is that, despite the disrepair into which much of this historic corner of the city fell in recent decades, there are residents here passionately committed to forging a strong sense of community.

"This economic development arm has to be the driver [...]" Jenkins said. "That is our key component, and we have never looked at it that way at Fair Park."

## What did city council members say?

At the top of most council members' concerns was the briefing itself. The agenda had been structured so that the committee members couldn't ask how the promised Community Park–a green space that would replace parking spaces in Fair Park–would be built and managed, since it was initially the responsibility of Fair Park First.

"I'm tired of the way things are being put on an agenda that gags us," Bazaldua said. "We've got major business in the city that we need to discuss, and I don't like it being parceled and siloed out for us to not actually get to the elephant in the room."

Fair Park First secured a $3 million donation for the Community Park just this June and has raised more than $30 million in total, leaving them just $6 million shy of their fundraising goal. But that funding is in limbo now that the city has formally ended its contract with Fair Park First after the fallout with OVG. City officials have pointed out that the cash is tied to Fair Park First, and that not working with them would mean securing a deal with another nonprofit to restart the fundraising process.

However, some on the Park and Recreation board (a group of residents appointed to oversee the city's portfolio of parks and recreation facilities) have voiced a desire to remain cautious, taking a wait-and-see approach. They'd like to review a full audit of the nonprofit's spending and funding

before jumping into another contract with the nonprofit.

Advertisement

While the Community Park was not mentioned in the presentation, Jenkins said it plays a vital role in the revitalization of Fair Park. The conversation around the Community Park is especially sensitive given it's seen as an effort to undo some of the damage caused when homes owned by the Black community in South Dallas were razed and removed with eminent domain to expand Fair Park in the 1960s. Councilmember Paul Ridley also echoed support for the Community Park.

"I was surprised that it was not included–not even mentioned–in this presentation, because it not only is something that the community wants, it's something that would constitute an investment in attracting economic development in that vicinity," he said.

As for the actual presentation from Parks and Rec executives, committee members were hungry for more specifics. "This presentation is what you want to do — can you tell us what you're doing now to fulfill any of the opportunities and promises you've already provided?" Councilmember Lorie Blair said. O'Connor told the committee a "very detailed plan and timeline" would be ready "probably early second quarter of next year."

## What happens next for Fair Park?

Park and Rec will focus on what they call "low-hanging fruit." This includes throwing more festivals at Fair Park (Ridley suggested a Christmas event),

hosting family-friendly events at the Leonhardt Lagoon Nature Walk, and focusing on forming a committee to manage the Cotton Bowl. Officials also said they are currently securing short-term contracts for security on the park premises and reviewing older contracts. They'll then begin looking at longer-term contracts that will hand over venue advertising to private partners.

Bazaldua requested that future conversations include the full council and the city manager. "I don't ever want to have a Fair Park presentation that doesn't include the city manager to talk about how any of the plans you're bringing forward is going to also include work from their office to get it done," he said. "We've got to stop the siloed approach, or any of these plans are not going to be successful."

---

## Author



**Dylan Duke**
View Profile ⟶

Fair Park

Exhibit F-3

**KERA**News

Donate

# Fair Park's back under city control — and Dallas wants to make it profitable

**KERA | By Megan Cardona**

Published October 9, 2025 at 3:09 PM CDT





KERA
**Morning Edition**

Philip Lange / Shutterstock

The city of Dallas officially took over operations at Fair Park in September after canceling its contract with Fair Park First and Oak View Group.

Dallas Park and Recreation is exploring ways to make historic Fair Park profitable after seven years of, what city leaders call, "lost time."

The city officially took over the park's operations in mid-September after ending its contract with the nonprofit Fair Park First and its for-profit partner group Oak View Group earlier this year.

Now the city has its work cut out for it, with a lengthy list of deferred maintenance and missed event opportunities that could have taken place at the park.

During Thursday's Park and Recreation Board meeting, Ryan O'Connor, deputy director of Dallas Park and Recreation, emphasized collaboration with partner groups, community events, and utilizing Fair Park's large, 277-acre campus as potential ways to increase funding.

Part of that revitalization plan includes reviewing and modifying existing contracts and securing new tenants for vacant buildings.

O'Connor also said they want the Dallas Economic Development Corporation to initiate an economic development study in partnership with local chambers of commerce and surrounding business associations near Fair Park.

"We want to make sure everyone is working together so that Fair Park can be what we all want it to be," O'Connor said.

Park and Recreation Director John Jenkins said he considered the revitalization of Fair Park as "very high level" because they're making up for lost time. He contributed problems from the last seven years — since the Fair Park First and OVG contract was created — to governance, execution, and failure to maintain the park grounds.

Jenkins said Fair Park will not succeed without including its surrounding community in South Dallas.

"If we don't reconnect with the surrounding community, we will fail," he said.

## Fair Park fallout

Fair Park First and its partnership with then-management group Spectra Venue Management were established in 2018 to improve the management and operations of Fair Park, which lost money when run solely by the city of Dallas, KERA previously reported.

Fair Park First was created to fundraise for the park and preserve its history. Spectra was brought in to manage the finances and daily operations of the park.

However, none of the people who created the partnership were calling the shots seven years later.

Spectra was later acquired by Oak View Group. Fair Park First had new leadership since it was established, and city officials who approved the original contract no longer hold office.

An independent audit released last year revealed Fair Park First had misallocated $5.7 million out of the total $17 million in restricted donor funds managed by Oak View Group between Oct. 1, 2020 and April 30, 2024. The funds — meant for specific purposes — were still spent on Fair Park, but were used for park operations and unqualified projects outside of their intended purpose.

Details of the audit resulted in finger-pointing between the two groups because the contract gave no specifics on who was at fault if something went wrong.

Although the contract has ended, Fair Park First still exists.

Fair Park First is scheduled to appear before the Park and Recreation Board in November to move forward with a memorandum of understanding with the city concerning the community park.

Veletta Forsythe-Lill, Fair Park First immediate past chair, told KERA that the non-profit has raised $33 million of the $39 million needed for the project and plans to break ground after the FIFA World Cup in 2026.

*Got a tip? Email Megan Cardona at mcardona@kera.org.*

*KERA News is made possible through the generosity of our members. If you find this reporting valuable, consider making a tax-deductible gift today. Thank you!*

**Tags**  Government    Government Accountability    City of Dallas    Fair Park

city parks





## Megan Cardona

Megan Cardona is the Dallas Accountability Reporter for KERA News, covering city government and issues impacting Dallas residents. She was born and raised in the Dallas-Fort Worth area and previously worked at the Fort Worth Star-Telegram.

**See stories by Megan Cardona**

JS 44 (Rev. 04/21) (TXND 4/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**ORIGINAL**

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| ERICK KING, individually and on behalf of TINMAN | See attached continuation sheet |

| **(b)** County of Residence of First Listed Plaintiff  Dallas County, Texas | County of Residence of First Listed Defendant  Dallas County, Texas |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)*  NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

| **(c)** Attorneys *(Firm Name, Address, and Telephone Number)* | Attorneys *(If Known)* |
|---|---|
| Erick King, Pro Se - 14181 Noel Rd Dallas, TX 75254  469-834-4688 - eking@tinmanmto.com | Dallas City Attorney's Office - 1500 Marilla Street, 7th Floor  Dallas, TX 75201 |

RECEIVED  JAN 29 2026  CLERK U.S. DISTRICT COURT

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government  Plaintiff
- ☐ 2  U.S. Government  Defendant
- ☐ 3  Federal Question  *(U.S. Government Not a Party)*
- ☐ 4  Diversity  *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place  of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place  of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a  Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** ☐ 310 Airplane ☐ 315 Airplane Product Liability ☐ 320 Assault, Libel & Slander ☐ 330 Federal Employers' Liability ☐ 340 Marine ☐ 345 Marine Product Liability ☐ 350 Motor Vehicle ☐ 355 Motor Vehicle Product Liability ☐ 360 Other Personal Injury ☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY** ☐ 365 Personal Injury - Product Liability ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability ☐ 368 Asbestos Personal Injury Product Liability **PERSONAL PROPERTY** ☐ 370 Other Fraud ☐ 371 Truth in Lending ☐ 380 Other Personal Property Damage ☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 ☐ 690 Other | ☐ 422 Appeal 28 USC 158 ☐ 423 Withdrawal 28 USC 157 **INTELLECTUAL PROPERTY RIGHTS** ☐ 820 Copyrights ☐ 830 Patent ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 375 False Claims Act ☐ 376 Qui Tam (31 USC 3729(a)) ☐ 400 State Reapportionment ☐ 410 Antitrust ☐ 430 Banks and Banking ☐ 450 Commerce ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations ☐ 480 Consumer Credit (15 USC 1681 or 1692) ☐ 485 Telephone Consumer Protection Act ☐ 490 Cable/Sat TV ☐ 850 Securities/Commodities/ Exchange ☐ 890 Other Statutory Actions ☐ 891 Agricultural Acts ☐ 893 Environmental Matters ☐ 895 Freedom of Information Act ☐ 896 Arbitration ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision ☐ 950 Constitutionality of State Statutes |
| ☐ 120 Marine | | | | |
| ☐ 130 Miller Act | | | | |
| ☐ 140 Negotiable Instrument | | | **LABOR** | |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | | | ☐ 710 Fair Labor Standards Act | |
| ☐ 151 Medicare Act | | | ☐ 720 Labor/Management Relations | |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | | | ☐ 740 Railway Labor Act ☐ 751 Family and Medical Leave Act | |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | | | ☐ 790 Other Labor Litigation ☐ 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI ☐ 865 RSI (405(g)) |
| ☐ 160 Stockholders' Suits | | | | |
| ☐ 190 Other Contract | | | | |
| ☐ 195 Contract Product Liability | | | | |
| ☐ 196 Franchise | | | | |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | **FEDERAL TAX SUITS** |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | |
| | ☐ 448 Education | ☐ 550 Civil Rights ☐ 555 Prison Condition ☐ 560 Civil Detainee - Conditions of Confinement | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 1983 - Civil Rights Act

Brief description of cause:
See attached continuation sheet

| **VII. REQUESTED IN COMPLAINT:** | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | **DEMAND $** | CHECK YES only if demanded in complaint:  **JURY DEMAND:** ☐ Yes ☐ No |
|---|---|---|---|

| **VIII. RELATED CASE(S) IF ANY** | *(See instructions):* | JUDGE  None | DOCKET NUMBER  None |
|---|---|---|---|

| DATE  01/29/2026 | SIGNATURE OF ATTORNEY OF RECORD  *EK* |
|---|---|

**FOR OFFICE USE ONLY**

| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE |
|---|---|---|---|---|

# ATTACHMENT TO CIVIL COVER SHEET – Defendants & Section VI

**Defendant(s)**

CITY OF DALLAS, TEXAS; CRYSTAL ROSS, in her official capacity as Deputy Director of Dallas Parks and Recreation; JOHN JENKINS, in his official capacity as Director of Dallas Parks and Recreation,

---

**Brief description of section VI cause of action:**

Plaintiff, a minority entrepreneur, alleges systematic exclusion from public-private partnership consideration by the City of Dallas Parks and Recreation Department in violation of the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment.

Over nine months, Plaintiff made more than two dozen documented attempts to present a comprehensive proposal that would cost the City nothing while creating jobs for minority communities and generating revenue for the City. Despite receiving a written promise of a meeting from Deputy Director Crystal Ross, Plaintiff was completely ignored. During this same period, Defendants maintained contractual relationships with Oak View Group (OVG), a non-minority company whose CEO was federally indicted for bid-rigging in June 2025, which misallocated $5.7 million in donor funds, owed $6 million to vendors, and was terminated for cause—yet continues to manage City facilities.

Plaintiff also alleges violations of the City of Dallas's Business Inclusion and Development (BID) Policy, which mandates M/WBE involvement "to the greatest extent feasible," as well as related state law claims including breach of implied contract, promissory estoppel, and intentional infliction of emotional distress.